The next case is Lincoln v. Burlington Northern Santa Fe Railway Company No. 17-3120. Counsel, you may proceed. Thank you, Your Honor. My name is David Schlesinger. With me today at counsel table are Charlie Delbridge and Lindsay Krause. Also, Gail Coleman from the EEOC. I'm going to allow a seat of five minutes to Ms. Coleman. I'd like to try to reserve two minutes for rebuttal. Keep an eye on things, then. Thank you, Your Honor. Before you get into the merits, I want you to tell me why we shouldn't just dismiss this and summarily affirm because your appendix was egregiously inadequate and there's not evidence in it that could support your argument. Your Honor, I'm sorry about that. We attempted to be attentive to the rules and we fudged it up, we screwed it up on the appendix. Well, it doesn't look to me like you were trying to be attentive. It looks to me like you were cherry picking only the evidence that was helpful to you and not any of the evidence that was supportive of the district court's opinion, which is why it's particularly troubling to me. Your Honor, there was absolutely no intention of cherry picking. I think our brief is quite fair in terms of the evidence that was cited. And as I reviewed the law, it looks like because defendant's counsel submitted a more robust appendix, which we have cited in our reply brief, I think that under the current law that the court should consider the matter on the merits. We can, but we don't have to. That's okay. Well, again, I apologize and I'd like to proceed. There's something ironic about punishing your opponent by doing your work, for doing your work for you. Okay. This, I represent Lincoln and Mr. Lincoln and Mr. Mosbrucker. They were injured in 2007 as they were working welding a rail as welders. There was a train that came by and leaked a substance. It caused them to become injured. They were taken out of service. Excuse me. They continued to work in their jobs after a short period off. They continued for about 10 days off. They came back and continued to go back to their jobs and work for about two and a half years, after which time their lawyer sent a demand letter to BNSF alleging a FELA claim. BNSF removed them from service. And when they did that, they were never allowed to come back to work again. All right. And then they started to apply for jobs. And I think we have the chronology. And given the limited time, I'd like to jump right in. When they were put on medical leave in response to the letter, didn't the doctor say that the plaintiffs couldn't work outside? The doctor for BNSF, Dr. Clark, stated that she doubted the allegations. No, I'm just asking the medical evidence that came in on behalf of Mr. Lincoln and Mr. Mossbrugger, didn't it say that they should be restricted to indoor work? Yes. All right. Does the medical evidence restricting the plaintiffs to indoor work give any indication that some outdoor work would be all right? No. It's very basic. And the job that you're asking for accommodation, let's take Mr. Lincoln. The Carmen and pipe fitter jobs involve some outdoor work. So without the benefit of any additional medical evidence in the record to suggest that they can split time, why should that be the basis for an accommodation? Okay. That's the heart of the matter, Your Honor. That's what I'm asking. Okay. But if the restriction is strictly to indoor work, how do you get past that? Here's what the state of the record is. 30B6 testimony from the defendant that says that the shop jobs are essentially outdoor work. But that outdoor, as they define outdoor work, it's a building that we've submitted pictures of in our reply brief that is two football fields long. And there's a fact question about whether that constitutes outdoor work. Okay. I'm going to use a phrase that Judge Gorsuch always used to say in this room. We'll spot you that one. Okay. All right? That the shop is indoors. Okay. And that we're only talking about up to 10 percent work outside. Isn't that what we're talking about on those jobs? That's right. So how do they qualify for those jobs if the medical report says they have to work indoors, even if it's just 10 percent? Okay. So, Your Honor, if the Court looks at this Court's precedent under the Hawkins case, which is if the Court looks at Hawkins, for example, the employer bears the burden of production to state what the essential functions of the job are. And the employer has said, in this case, the essential functions of the shop jobs include working outside. But they haven't given us any detail there. And they haven't given us anything more other than their own 30 v. 6 testimony. There's no description about what it is exactly they need to do outside. There's no description about how there's a limited number of people to do this outside work. There's just no meat on the bones there. Well, but that's where the appendix comes in, because if you go into the appendix that, thankfully, BNSF provided, we have the job description for virtually all, but not all, of these jobs, which the employer has said that outdoor work is an essential function. So wouldn't we – don't we typically defer to the employer's job description and the employer's categorization of essential job functions? Your Honor, the – we do not have job descriptions. We have job postings. Job postings. And the job postings are different than job descriptions which are created prior to advertising for the job. And there is boilerplate language in those job postings that says you need to be able to work outdoors in all kinds of different weather conditions, okay? But there is no – if the Court looks at the regulations and the Hawkins factors, those Hawkins factors talk about what makes something an essential job component or an essential job function. And those things – things are like the job exists to do that job. These are shop jobs. They involve working in a shop in that building, in Building 12. Like there's a pipe fitter job that means working in that building on rail cars. There's a – there's a – you know, there's other jobs that are shop jobs that have specific functions. But what's – what's different about this case from the Hawkins case is in the Hawkins case, for example, there was a showing that there was a limited number of people that could drive a commercial truck. And so by virtue of the fact that there was a limited number of people to drive that commercial truck, the plaintiff needed to be able to occasionally drive that truck. And there's a showing that once in a while he drove that truck in the past. That's different than this case where we – we have an affidavit that's in the record from Mr. Steve Hopkins. And with due respect to the district court, it misread the affidavit. Mr. Hopkins' affidavit says, I am familiar with what happens in Building 12. And the district court thought that he was talking about a different building. He wasn't. He was talking about Building 12. And he said, I'm familiar with those jobs and it involves about 90 percent indoor work. So with respect to that 90 percent, we have a fact question about whether that should be defined as inside or outside. What are the shifts? Is it an eight-hour shift? Your Honor, I don't know the answer to that question. Ten percent would be 48 minutes, I think, if it were an eight-hour. What's the effect of both of these men saying that they could work for an hour, an hour and 15 minutes outside during a day? Does that matter? Is the railroad bound to that? Absolutely it matters. What happened is that in October 2012, when our clients submitted their request for accommodations and then a subsequent letter in December of 2012 in which they explained, we think we can work an hour, hour and a half outside, the railroad, it's undisputed, never engaged in the interactive process with them after that. They never responded to them. They never said, guys, go get additional doctor's notes. They never said, guys, what do you think about whether you can work in this particular type of environment? And that's a breakdown of the interactive process that, frankly, the BNSF bears in this case. I'm cognizant of the fact that my clock is ticking down, and I'd like to allow the EEOC to make some arguments. Thank you. And reserve the remainder of my time. Thank you. May it please the Court. I'm Gail Coleman from the Equal Employment Opportunity Commission. The EEOC has briefed two issues in this case, and my intention is to focus on exhaustion of administrative remedies, because the Court does not have to reach the issue of reassignment as reasonable accommodation. Why do we have to reach the exhaustion of administrative remedies in light of the stipulation between the parties in this case? Why doesn't the stipulation just take care of things? The question is whether exhaustion is a jurisdictional requirement. No, I understand. But the stipulation, why can't the stipulation be read as covering the 300-day period? Because if it's a jurisdictional requirement, then the parties can't waive that. I'm not saying they did. The question is whether the claims, the job claims, after the February 12, 2013 date are covered by the stipulation or not. And my question is, why can't the stipulation be read as not covering that period of time? As not covering that period of time? Yes, and then we wouldn't have to talk about your issue. Have you looked at the stipulation? Yes, yes. Okay. How do you read it? Well, I think on its face, it plainly says future, that exhaustion has, the parties have exhausted their administrative remedies out into the future. And I think that the appellant does a nice job briefing that. But at any event, that would be a question of contract construction, which should be going to the district court in the first instance. So that's why I think that we do need to reach exhaustion. All right. I know we are limited on time, so let me ask you another question. You want us to hold that the exhaustion requirement is a condition precedent and not a jurisdictional requirement. Why isn't that something that our en banc court would have to do? Well, first, I believe that this Court has already done that in GAD. Didn't do it in GAD. That was a narrower issue than the issue we've got here. It dealt with a specific procedure, the verification issue, and not whether exhaustion is a whole. So GAD does not resolve the issue. And we have a case after the Arbaugh case, post-Supreme Court decision in Jones, where we said that it is jurisdictional. So apart from the merits of your argument, doesn't that put this panel in a difficult position? And isn't this really an en banc matter? Well, respectfully, the post-Arbaugh cases don't engage with the reasoning of Zipes and Arbaugh. And in Zipes, the Supreme Court — Is that really the test? Well, if we — Counsel, if we have a panel opinion that came after a Supreme Court case and reaches a decision, why isn't this panel bound by that panel? Because the panel is bound by the Supreme Court. And in Zipes, the Supreme Court analyzed the exact same — Counsel, why are we bound by the Jones case? You're not bound by Jones because it was wrongly decided in light of Zipes. And when there is a Supreme Court — And it was decided after the Supreme Court case. So even if we're sympathetic to your argument, how can a three-judge panel overturn another three-judge panel? Well, certainly you're free to go en banc. And if you feel that you need to do that, we would encourage you to do that. But we don't believe that in light of Zipes, it's possible for this Court to continue to rely on law that is contradictory to Zipes. When you say this Court, though, you're talking about the Tenth Circuit, not just this panel. Correct. But the law is clear that if a Supreme Court case is inconsistent, is flatly inconsistent with the law of this circuit, then the Supreme Court — But it's got to be an intervening Supreme Court case. So if Jones v. Runyon, they had looked at Zipes and they had said, you know what, our prior decisions are wrong, and this is not jurisdictional, then we'd be great. But what it did was it looked and cited specifically to the intervening Supreme Court case and then said, yep, we still think it is jurisdictional. So the panel is really bound by Jones v. Runyon unless and until the full Court fixes it. Well, it's a panel — you do seem to feel that way, and then I would urge you to go en banc on that issue. I would urge you to tell us why we shouldn't feel that way. Well, I will say that in Jones v. Runyon, in all of the cases that happened after Zipes, there was no issue of waiver. It was all academic. In this case, it actually makes a difference. And again, I would like to point out that in Zipes, the Supreme Court analyzed the exact same statutory subsection that's at issue here. The provision that provides for timely filing requirements, which is what was at issue in Zipes, is the only provision in Title VII that provides for a charge filing at all. So the exact same reasoning of Zipes is directly on point for the charge filing provision. There's no way around it. The Court has already held that that is not jurisdictional because it is not in the jurisdictional provision because the provisions don't cross-reference each other. That subsection is not jurisdictional. So any circuit law to the contrary is just flatly wrong, and you are bound by Supreme Court law. If you want to go en banc to say that, then please do go en banc. But we feel that it's important that we're correct, and we urge you to do that. And I see my time is up, and I had hoped to save time for rebuttal. Let me ask you, with the indulgence of the Panel 1 question, on your second point, which is that if you have a qualified disabled employee, that they don't have to compete for a job for which they're qualified. That's your second point, right? Yes. We have a job where it's a clerk position where Mr. Lincoln, it required typing 25 to 35 words per minute. He typed 26 words per minute, and one of the reasons given was that he was barely qualified. Is that good enough? I mean, literally, they've got a range of what you need to type. I mean, under your position, would they have to turn down everybody that can type 35 words per minute and give the position to Mr. Lincoln, who can type 26 words per minute? Yes, and the reason for that is that employers set their own qualification standards. They should know what their jobs entail. And if somebody meets the employer's very own qualification standards, they can do the job. And given the policy of the ADA of keeping employees, disabled employees, in the workforce, that policy is so important, and reassignment is listed specifically as a reasonable accommodation. A reasonable accommodation has to enable you to perform the essential functions of the job, and just letting someone compete doesn't enable you to perform the essential functions of the job. Thank you. Thank you, counsel. Thank you. Hey, please court, counsel. I want to begin. Oh, excuse me, name, recording. I'm David Cooper, counsel for BNSF, the appellee in this case. I want to begin by addressing an overarching issue that's really dispositive of every issue in front of the court. That's a question as to whether the appellants were qualified in the district court finding, and the evidence supports the fact that they were not qualified for any of the positions to which they applied or which they desired. And that conclusion is fatal to all of the claims, the discrimination claim, the retaliation claim, the failure to accommodate claim, and the FRSA claims as well. And the district court based the unqualified finding on a finding that working in Building 12 was outside work. Do you think, I mean, isn't there at least a question of fact about that? We've got the testimony or an affidavit from Mr. Lincoln's brother about what the conditions were like in that building. It's heated during the winter. There's fans during the summer. Is that really outdoor work? Actually, I don't agree on that. With respect to whether it's outside or not, that is not the issue, and the district court did not conclude. And, in fact, as Judge Mapson said, they're spotted on that one. But that doesn't eliminate outdoor work as an essential function and an essential qualification. Why isn't that a disputed issue, though, even on the view that only 10 percent of the job is outside? Then why would the 10 percent be an essential function? Or is that a disputed issue? It is not a disputed issue, Your Honor, because we begin first with the statute itself, 12-111-8, which instructs that we qualify an individual as a person who can perform the essential functions. But consideration is given to the employer's judgment as to what functions are, in fact, essential. And if the employer is discreet, and I want to take it aside to say it's not a job description. The statute says a written description of the, before advertising and interviewing applicants, that is considered. And it's an evident, again, the employer has met its burden with advancing the burden of production of what they, what the employer's judgment of essential function is. And there is no evidence that that is not an essential function for at least 10 percent of the work. Well, what about the declaration of Mr. Hopkins? Mr. Hopkins, who worked in Building 17, not Building 12, he says, I'm aware of what goes on in that building and 90 percent of the work is performed under the roof of Building 12. That is not saying no outdoor work is required. There is no evidence in the record that outdoor work is not, in fact, an essential function for every job in the shop. Why can't that be accommodated? In other words, if you're spotting that the Building 12 is indeed indoors, now we're talking about 48 minutes on an eight-hour shift at the most if there's no break time, why couldn't the employer simply, as one of the employers, maybe Mr. Lincoln says, a number of employees who are cooped up inside that building would welcome the opportunity to be outside a little bit more, so they just adjust the functions. It's an entire, the shop, that shop itself is an entirely a union shop. The jobs that are within that shop are subject to seniority bid and the work within the building can't be divided up based upon who can or can't work outdoors. Is that an undue burden argument? No, it's an unreasonableness. It is unreasonable to require the employer to deviate from a collective bargaining agreement as a reasonable accommodation. The collective bargaining agreement says 90% and 10%. Pardon? The collective bargaining agreement says. No, the collective bargaining agreement establishes a hierarchy of seniority and who can bid on what jobs. Some jobs take place more. There's more under the roof and less outdoors. There's some that are more outdoors. Are you saying that an employee who accommodated and was willing to spend more than 10% of the time outside so that Mr. Lincoln could spend all his time inside if that's even necessary, he says he can work an hour outside, that that employee would have a grievance under the collective bargaining agreement? I want to be sure I'm understanding. The employee who's now going to be working more than 10% outside. If they didn't have the seniority to bid on one of those positions that minimized the outdoor work, that there's not a grievance to allow them to jump seniority. Let me ask you this. In her 30B6 deposition, Ms. Artzer said that Mr. Lincoln was qualified or minimally qualified for the position of boiler maker, which I understand is a Building 12 job, and the position of mechanical shop laborer. If he was minimally qualified or qualified for those jobs, how could he not be qualified for other Building 12 jobs? He met the minimum qualifications to be considered for an interview for that position. The fact that he can't work outdoors removes that qualification from all positions. He can't work outdoors. How can he meet the minimum for the minimum qualifications to be interviewed for the position if it requires outdoor work and he can't work outdoors? We jump into the weeds, but let's get down there so we understand. The employer does not consider the medical condition and the restrictions and the inability to work outdoors unless and until there's a qualified offer made. And Mr. Lincoln never made that position. So he possessed that. But he was selected as an alternate for the boiler maker position, wasn't he? Correct. He was never offered the job, and that's when the medical clearance comes into play, and that would then be where they consider are you in fact medically cleared to perform the work, and the undisputed evidence is the answer to that is no. So they select the person for the boiler maker job, and they select an alternate for the boiler maker job before they know whether either of those people meet the minimum qualifications for the job. That's right, because you don't ask the medical questions while you're in the pre-employment, pre-offer stage. With respect to whether Building 12 is or isn't outdoor work, and I want to be sure to draw the panel's attention to this, while we spot whether or not that is or isn't outdoor work, that doesn't resolve Mr. Lincoln's problems. Because it's not just that he can't work outdoors, he can't work around allergens. And photographs that they didn't give you of that two-football-long field are the enormous doors on both ends that are open almost all of the time to allow locomotives to go through, and everybody in that building is exposed to the allergens that blow through. Was that one of the stated reasons for disqualifying him from the job? Can't work outdoors, and I want to be clear with respect to the only position for which Mr. Lincoln was denied a position because he couldn't work outdoors is a safety assistant position. All of the others, he never made it to the employment offer stage where that would become consideration, and what Judge Crabtree held was not that he was denied, or if you can read the language to say he was denied because of that, no, he's not a qualified individual because he can't work outdoors. Because the lack of qualification precludes him from making a promissory case in the first place. So, you know, had he completed the dance, made the pre-employment, or made the offer, then done the medical clearance and discovered that he can't work outdoors, that it would have nonetheless precluded him from holding the position. Counsel, I've been thinking about the exchange you had with Judge Phillips. It seems to me that we've got, let's say we have a job that's 10% outdoors, and Judge Phillips asked you, well, 10% isn't all that much, what about accommodating that somehow? And your response was, well, that runs into union collective bargaining issues. I'm trying to remember, was that argument in your brief? Yes, it was. Okay. At the district court level. And does it go to the question of whether working outdoors for one of those jobs is an essential function, or is it something else? I'm just trying to figure out where it fits in the analysis. Is it an essential function? Well, I don't believe it's an analysis, I know it's not one that the district court got to. It's a question of can that job be modified in order to, and he resolved that through the Hawkins and Wells and Shalala analysis, that it is truly an essential function, and there is no evidence that none of those shop jobs, or that any of those shop jobs did not truly require outdoor work. In removing that essential function of being able to work outdoors on a locomotive that's outdoors is a required function. Okay. But once something is deemed to be an essential function, then does that end any consideration of making an accommodation for that function? Well, in the order of proof, it becomes, then becomes has the plaintiff brought forward any evidence to dispute the employer's production that working outdoors is indeed in the employer's judgment, and by written description, an essential function.  90% of the work occurs underneath the work, underneath the roof. It is not a requirement that every employee truly be able to work outdoors, because they do. Does the stipulation say that you waive exhaustion for any claim after April, what is it, April 16, 2012? Going forward, there's no end point? It doesn't say that, at least not in so many words. In the context of the stipulation was to resolve a motion to dismiss, which was directed at entirely all of the 2010-2012. I understand, but is there an end point to your waiver in the stipulation? Yeah, it's for five positions, which fall outside. Give me a date. Does it end on February 12? For Mr. Lincoln, it does. Is that what you think the stipulation says? For Mr. Lincoln, it does. But it doesn't say that. Correct. It says after April 16. Correct. So how can, are you saying we should read it to be April 16 to February 12, 2013, for Mr. Lincoln? In the context in which it was made, which was that stipulation was solely to resolve the motion to dismiss, which was directed solely at job applications occurring before April 2012. Yeah, 2012. And it's because that resolved the motion, and that was the end of the stipulation. Even though it doesn't say that, the reason you think we should understand it to say that is because of context. One, it doesn't say you've exhausted for all future claims, whether they were or were not actually contained within any charge in front of the EEOC. And two, again, we've run into Jones v. UPS, which is it is a jurisdictional requirement. Well, okay. But if we were to accept your interpretation of the stipulation, we wouldn't even be dealing with Jones v. UPS, would we? True. And there's an alternative basis for also not having to reach the issue of the stipulation, which is where I started, is they're not qualified for any position. The five positions to which the stipulation could potentially matter are two March 2013 jobs applied for by Mr. Lincoln, and one on August of 2013 applied for by Mr. Lincoln. The same can't work outdoors issue addresses and disposes of that argument. Excuse me. If I said Mr. Lincoln, that's Mr. Mossberger. What do you make of the two workers, Lincoln and Mossberger, saying that they could work outside for an hour, an hour and 15 minutes a day? Their doctor didn't say that. Okay. Did you tell them that if their doctor came back and said that that would be fine, that they could apply and get these jobs? In a manner of speaking, I want to address how that happened. After two and a half years, this process had went its way to a conclusion, and their first request for accommodation crossed in the mail, literally, with a letter from the environmental health folks saying, we're out of options. You can't work outdoors. You don't have the qualifications to hold a clerk job. We're willing to pay you to go get some training and education to get you qualified for some other position. Please let us know if any of these conditions change. And it's undisputed that they never came back with anything saying anything had ever changed. Well, is it news to you today that they said that they could work an hour, an hour and 15 minutes outside? No, it's not. In fact, I cite that in my brief. You learned that from? From their request for accommodation in the December 4 request for accommodation. When you saw that, you didn't write back and say, well, that's great. We've got lots of jobs for you. You just need to have your doctor send us something. They did not do so. They left it on the environmental health letter, which is, if your condition changes, if your medical condition changes, let us know. All right. So if they send a letter to you now that says, here's my doctor, my doctor says an hour, then you're going to say welcome. No, we're going to say we're going to go through the interactive process and then just see if that's a reasonable accommodation and what job they're desiring. Counsel, thank you for your argument. Well, they went over a little bit, too. Have we exhausted time for both sides now? I think we have. All right. Thank you to all counsel who participated and attended today. We appreciate your arguments. The case will be submitted and counsel are excused.